Staples, J.
That Leftwieh was principal in the bond to Callaway, and Price merely his surety, does not, I think, admit of serious question. Leftwieh proves the fact, and he is not contradicted by any other witness. It is very true that upon cross-examination he says it is his impression that Price was surety merely; but I do not understand him as intending to qualify his previous positive statement to the same effect. Leftwieh of course well *5 knew how the fact was, and his admission, .so manifestly against his interest, that he alone was principal, is entitled to great weight. Besides, his testimony is corrobo-rated by all the circumstances. Leftwich’s appeal [to Callaway for indulgence, his proposal to give the negotiable notes, the whole tone and temper of his letter to Callaway, show that he considered the debt as his own, and the burden of discharging it as resting exclusively upon him. Callaway nowhere in the record appears as denying the fact, although an opportunity of doing so was afforded him when his deposition was given, and although it was manifestly the turning point in the case. Under all these circumstances we are bound to conclude that Leftwieh was principal and Price his surety.
The main question in the case to be considered is, whether Price’s estate is released by the dealings between Callaway and Leftwieh.
It appears that Callaway institued an action on the bond against Leftwieh in December, 1860, and in January, 1861, Callaway took from Leftwieh, at the earnest solicitation of the latter, three negotiable notes with responsible endorsers, for three hundred and forty dollars each, being the amount then due on the bond, and thereupon the action was dismissed-. These notes were payable three, six and nine months after date. At the maturity of the first note the sum of $>150 was paid upon it; and this was all that was ever paid. The first and second notes were several times renewed. The renewed notes and the nine month’s note remained in the hands of Callaway’s counsel until the year 1866, when suit was brought upon them. The maker, Leftwieh, and the endorsers had in the meantime become wholly insolvent, and nothing was realized from that source.
There is some conflict in the testimony upon the point whether these notes were taken by Callaway in discharge of the debt, or simply as collateral security. Leftwieh *6 swears positively they were accepted in satisfaction: Callaway says they were taken merely as collateral security; -and his counsel agrees with him. But as the information of the latter was derived wholly from the statements of his client, it is not entitled to the weight it otherwise would have.
The matter to be noted, however, is that Callaway states he did not agree to give time to Leftwich. He says that Leftwich proposed to give the notes as collateral security; that he declined to go into the arrangement until he could consult his counsel; and the latter advised him the arrangement would not in any manner impair the obligation of the bond; and upon this advice he received the notes as collateral security. Now Callaway may have believed, and his counsel may have thought, the taking the notes would not impair the obligation of the surety, or even, operate as a suspension of a right of action on the bond. The question is not what they believed, but what was the legal effect of the arrangement, in the absence of an express agreement that the acceptance of the notes should not suspend a right of action on the bond.
The proposition with respect to the notes came from Leftwich. There is no doubt his sole object was a dismissal of the suit, and an extension of time; and Calla-way knew it.
Leftwich in his letter to Callaway, says: “If you prosecute this suit you will cause others to sue, and it will terminate in sacrificing my property. I say sacrifice, because no property, uuder existing circumstances, can be sold except at a sacrifice.” Further on, after an earnest appeal for indulgence, he says: “ If you will dismiss this suit, I will give you three negotiable notes at ninety days each—the first third you will get iu ninety, the second third you will get in six months, the third and last in nine months, the discount and interest to be added.”
Surely, after reading this letter no one can have any *7 difficulty as to Leftwich’s understanding of the arrangement; and that Callaway understood it in the same way is most manifest from the fact that shortly afterwards the ■ notes were given, the action upon the bond was dismissed, and no effort is ever made to collect it until all the parties to the negotiable notes, maker and endorsers, had become utterly insolvent. It is impossible to believe upon these facts, that both parties did not perfectly understand the debtor was to have further time. . To.adopt any other conclusion is to suppose that Leftwich not only gave the notes without an object, but that he was willing to subject himself to a recovery on the bond while his negotiable notes were or might be current in the hands of bona fide holders.
I attach no sort of importance to the fact that Callaway did not surrender the bond. It was no doubt filed among the papers when the suit was brought, and there remained after the suit was dismissed. Besides, Callaway’s retention of the bond is perfectly consistent with the arrangement to give time, which was all Leftwich desired.
But if I am mistaken in supposing there was an express agreement for further time, there can be no doubt the legal effect of accepting the notes was to suspend the right of action on the bond during the period allowed for the payment of the notes. Whilst the mere taking a negotiable security, payable at a future day, does not, unless so agreed,, operate as a payment of an antecedent debt, it does operate to suspend the right of action on the original demand until the maturity of the bill or note, unless it is made to appear it was received simply as collateral security.
It is a conditional satisfaction with respect to the principal ; and with respect to the surety it is absolute, unless it plainly appears the parties intended otherwise. Rees v. Berrington, 2 Lead. Cases in Equity, 1915; Putnam v. Lewis, 8 John. R. 389; Myers v. Wells, 5 Hill’s R. 463; Brandt on Suretyship and Guaranty, § 316.
The reason is said to be that the creditor, by negotiating *8 the bill or note, and passing it into the hands of a bona fide holder, may expose the debtor to the payment of both - claims. In some of the cases it is held that taking the negotiable security creates a conclusive presumption of law of an agreement to suspend. In other cases it is held, and with better reason, it is simply a question of intention. If the parties agree that the right of an action on the original debt shall not be stayed, the surety will not be released. But in the absence of such agreement, the effect of taking the notes or bill, in the case of a pre-existing debt, is a suspension, and a consequent discharge of the surety. It is not for the surety to prove an agreement to stay the action, but for the creditor to show that by agreement the negotiable security does not entitle the debtor to forbearance. See Armistead v. Ward, 2 Patton & Heath, 816; Blair & Hoge v. Wilson, 28 Gratt., 165, 171, 173. In the ease before us, it is not proved, there is nothing from which it may be inferred there was an agreement that Callaway might proceed on the bond notwithstanding the negotiable notes. On the contrary, all the circumstances indicate the understanding that further time was to be given.
The learned counsel for the appellant insists, however, that Leftwich, as the personal representative of Price, w'as not prevented by the arrangement from taking the necessary steps to protect the estate of his intestate. If, for example, he had given Callaway notice to sue, he (Leftwich) could not by plea, or by injunction, have stayed Callaway’s hands. He might, if he pleased, have paid the debt out of the assets, and then given a lien on his own estate to indemnify his intestate’s estate. It is a sufficient answer to say that Callaw’ay, by his dealings with Leftwich, had created an irreconcilable conflict with Leftwich’s interest as an individual and his duty as personal representative; and it does not lie in the mouth of Calla-w’ay to say that Leftwich might or ought to have given *9 such notice. If we can suppose so improbable an event as a notice by Leftwich, the personal representative, to Callaway to bring such suit, we must suppose that Left-wich, as an individual, would claim the benefit of the agreement for indulgence.
The idea that Leftwich might have paid the debt out of the assets of Price’s estate, and then given a lien on his own property as indemnity, is still more untenable.
If ive may presume he had in his hands assets available for that purpose, upon what principle, or by what right, could Leftwich, as personal representative, direct these assets to the payment of his own debts to the injury of Price’s creditors and distributees? Such an act would have been a gross breach of trust, a devastavit on the part of Leftwich, for which Callaway himself would have been responsible. The proposition cannot for a moment be entertained that Callaway may relieve himself of the effects of an improvident arrangement with his debtor by insisting that a personal representative ought to have misapplied the assets in his hands.
It has been further argued that an agreement to forbear will not release the surety, if made with his knowledge and consent; and in that case Leftwich, being at the time the personal representative of the surety, must as such liave consented to the arrangement with Callaway.
It is very clear, however, that Leftwich was acting for himself only. He did not profess to represent the estate of Price in anything that was said or done. And before that estate can be held bound it ought plainly to appear that Leftwich in his character of administrator consented to the arrangement. It is not enough that he was merely passive. It would be necessary to show that he actively ■concurred and consented as administrator to be bound by the new agreement. Brandt, §299. But if it be conceded that such assent was given, it was a palpable breach of 'official duty. The effect of the arrangement was to de *10 prive the representative of Price’s estate of the legal right to insist upon payment of the debt by the principal, or to--pay the debt himself, and to proceed at once against the principal. It will scarcely be denied that if the personal representative of the surety agrees that the creditor may-give time to the principal debtor, and in the meantime the-principal becomes insolvent, and the estate of the surety is required to pay the debt, the personal representative-will himself be held to answer out of his own estate. 2; Lomax Exo’rs, 295; mar. 471, 476, 485, top.
It is equally clear, I take it, that any one who concerts-with an executor or administrator in any manner contrary to the duty of the latter, will himself be held answerable. Graff v. Castleman, 5 Rand. 195, 203. If, therefore, the-creditor enters into an arrangement with the personal representative of the surety, the effect of which is to throw the loss upon the estate of the surety, he can stand on no-higher ground than the personal representative himself occupies. And in this case if it be conceded that Callaway obtained the consent of Leftwich as administrator to the-arrangement-, he is precluded from claiming any benefit from that consent to the injury of Price’s estate.
The learned counsel tells us, however, the arrangement, was an advantageous one for all parties, especially the-surety, inasmuch as it furnished a new and additional security for the debt. It may have so appeared at the time,, but the result has proved the very reverse. It is most apparent the indulgence extended to Leftwich is the cause-of all the difficulty in this case. If’ Callaway, instead of' yielding to his solicitations for delay, had proceeded with.his suit, and obtained his judgment, he would have secured his lien, and ultimately realized his debt. His conduct with respect to the negotiable notes was equally unjust to Price’s estate; for after receiving them he left therm in the hands of his counsel, without an effort to collect or-even to secure his debt by judgment until all the parties, had become insolvent.
*11 But if it was conceded the arrangement was an advantageous one to the estate of Price, the concession would not help the cause of the appellant. It is well settled law that if the time of payment be extended by an agreement binding on the creditor, the surety is discharged even though the extension of credit may prove to be a benefit to him. Because the question whether the alteration be beneficial or the reverse depends on circumstances that cannot always be judicially ascertained, and-the surety can no longer require the principal to fulfil the contract in its original form. Rees v. Bowington, 2 Lead. Cases in Equity, 1908; 10 John. R. 70; 7 Hill’s R. 250.
For these reasons I think there is no error in the decree of the circuit court, and that it ought to be affirmed.
Christian and Anderson, J’s, concurred in the opinion of Staples, J.
Judge Moncure was not present when the opinion was delivered, but he had read the opinion and concurred in it.
Decree appirmed.